**FILED**

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

SEP 3 0 2009

CLERK U.S. BANKRUPTCY,
ORLANDO DIVISION

In re:

PAUL G. RICCI and
CHARISSE E. RICCI,

Case No. 6:09-bk-00914-ABB
Chapter 7

Debtors.

_____/

## MEMORANDUM OPINION

This matter came before the Court on the Motion to Dismiss (Doc. No. 40) filed by Donald F. Walton, the United States Trustee for Region 21 ("UST"), seeking dismissal of this case pursuant to 11 U.S.C. Sections 707(b)(1), 707(b)(3)(A), and 707(b)(3)(B). A final evidentiary hearing was held on July 22, 2009 at which the Debtors Paul G. Ricci ("Mr. Ricci") and Charisse E. Ricci ("Mrs. Ricci") (collectively, "Debtors"), their counsel, and counsel for the UST appeared.

Granting the Debtors relief would be an abuse of the Chapter 7 provisions. This case is due to be dismissed pursuant to 11 U.S.C. Sections 707(b)(3)(A) and 707(b)(3)(B). The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## FINDINGS OF FACT

The Debtors filed a joint Chapter 7 petition on January 28, 2009 ("Petition Date") (Doc. No. 1). They previously filed a joint Chapter 7 case in 1990, In re Paul Guy Ricci and Charisse Eileen Ricci, Case No 6:09-bk-01742-CTC, and obtained a discharge in 1991. Mr. Ricci is employed by SunTrust Mortgage, Inc. ("SunTrust") as a manager of

the wholesale mortgage department. He refers to himself as a "day trader" and earns unspecified income through day trading. Mrs. Ricci does not work outside the home, with the exception of occasionally selling jewelry as a Lia Sophia representative. The Debtors have a nineteen year old son who attends Florida Atlantic University full-time and a fourteen year old daughter who lives with them. Their son resides with them during the summer.

This case is governed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005[1] ("BAPCPA"), which broadened the standard for dismissal of Chapter 7 cases from "substantial abuse" to "abuse" and created a rebuttable presumption of abuse. The UST seeks dismissal, as an abuse of the provisions of Chapter 7, based on the Debtors' bad faith or, in the alternative, the totality of the circumstances of their financial situation.

### Financial Disclosures

The Debtors filed Schedules, Statement of Financial Affairs, Statement of Intention, and Chapter 7 Statement of Current Monthly Income and Means-Test Calculation on the Petition Date (Doc. No. 1). They listed total assets of $1,436,165.69 comprised of real property valued at $1,368,000.00 and personal property valued at $68,165.69. They listed total debts of $2,042,472.84 comprised of secured debts of $1,694,629.53 and general unsecured debts of $347,843.31. The Debtors were ineligible for Chapter 13 on the Petition Date because their unsecured and secured debts exceed the debt limitations of 11 U.S.C. Section 109(e).[2]

---

[1] Pub. L. No. 109-8, 119 Stat. 23 (2005).

[2] The Debtors are eligible for Chapter 11.

The Chapter 7 Trustee George E. Mills held and concluded the Debtors' 11 U.S.C. Section 341 meeting of creditors on February 27, 2009 and filed a Report of No Distribution on March 2, 2009, designating this case a no asset case. He has made no appearance and taken no position in this dismissal matter.

### *Real Property - Residence*

The Debtors own four parcels of real property (Doc. No. 1, Schedule A). They jointly own their residence located at 3202 Deer Chase Run, Longwood, Florida 32779 ("Residence") which is a home with a covered pool located in an exclusive, gated community. They purchased the Residence in December 2002 for $670,000.00 and value it at $825,000.00 in Schedule A. Mr. Ricci believes the current value is in the mid-$700,000.00 range.

The mortgages encumbering the Residence exceed its value. The Debtors refinanced the Residence in 2005 and withdrew equity of $200,000.00. They refinanced the Residence in 2007 and withdrew nominal equity. SunTrust holds a first-priority mortgage of approximately $742,000.00 and National City Mortgage hold s a second-priority mortgage of approximately $201,811.00. The SunTrust loan has a ten-year term with interest only payments and a fixed interest rate of 7.3%. The National City loan has a twenty-year term with interest only payments and an adjustable interest rate of prime less .5%. The monthly mortgage payments total $6,751.18, with $5,698.18 to SunTrust and $1,053.00 to National City Mortgage.

The Debtors refer to the Residence as "homestead" property, but did not claim the Residence as exempt and filed a Statement of Intention setting forth they intend to surrender it. They have not surrendered the Residence and intend to retain it. They filed

a Motion for Limited Relief from Stay, post-trial on July 20, 2009 (Doc. No. 51), requesting the automatic stay of 11 U.S.C. Section 362(a) be lifted for the purpose of negotiating a loan modification with SunTrust. An Order was entered on July 29, 2009 lifting the automatic stay for the limited purpose of "discussing and implementing loan modification with SunTrust . . . ." (Doc. No. 61).

### *Real Property – Fox Valley Property*

Mr. Ricci, individually, owns a residential property located at 711 Fox Valley Drive, Longwood, Florida 32779 ("Fox Valley Property") described by the Debtors as "rental property" (Doc. No. 1). He purchased the property in January 2007 and the Debtors value the property at $284,000.00. It is encumbered by a first-priority mortgage of approximately $399,900.00 held by Aurora Loan Services, Inc. ("Aurora"). The monthly mortgage payments are approximately $3,576.00.

The Debtors have not lived in the Fox Valley Property. Mr. Ricci's sister, Lynne Ferrera, and her husband, Robert Ferrera, have lived in the property since September 2007. They were paying monthly rent of $2,200.00 to $2,480.00 to the Debtors, but have not paid rent since November 2008.[3] Mr. Ricci stated he pays the utilities for the property and his sister reimburses him. He explained he does not deposit her utilities payments into a bank account and uses the funds for living expenses.

The Debtors set forth in their Statement of Intention they intend to surrender the Fox Valley Property. They ceased making mortgage payments in November 2008. Aurora sought relief from the automatic stay for pre- and post-petition mortgage payment

---

[3] Deposits from Lynne Ferrera were made into the Debtors' Chase Bank checking account prepetition: (i) $2,200.00 in July 2008; (ii) $2,480.00 in August 2008; (iii) $2,480.00 in September 2008; (iv) $2,200.00 in October 2008; and (v) $2,464.00 in November 2008.

defaults (Doc. No. 20) and its motion was granted by the Order entered on April 1, 2009 (Doc. No. 32).

Mr. Ricci stated the property is in foreclosure and his sister has filed for bankruptcy protection.[4]  The Debtors did not disclose their rental relationship with the Ferreras in Schedule G and did not list the Ferreras' unpaid rent as a receivable in Schedule B.

### *Real Property – Condominiums*

The Debtors own two condominiums, Unit Numbers 432 and 603, in Plaza Resort & Spa, a condominium hotel complex located at 600 North Atlantic Avenue, Daytona Beach, Florida.  Mr. Ricci and his mother jointly own Unit 432.  The unit is encumbered by a mortgage.  The Debtors state in Schedule A Mr. Ricci is not an obligor of the note or mortgage, but Mr. Ricci testified he does not know if he is an obligor.  His mother makes the mortgage payments.  The Debtors value Unit 432 at $124,000.00 and assert it has no equity.  Mr. Ricci's mother resides in Orlando and rents the unit.

The Debtors jointly purchased Unit 603 in January 2006 for $366,000.00.  They value the unit at $135,000.00 in Schedule A and Mr. Ricci believes the unit is now worth $100,000.00.  Mr. Ricci uses the unit sporadically and the Debtors occasionally rent it to third parties through the building's on-site management company.

The Debtors stated in their Statement of Financial Affairs they received no rental income in 2009 or 2007 and received $11,519.00 in 2008.  They did not delineate whether the rental income is from the Fox Valley Property or Unit 603.  They claimed

---

[4] Robert and Lynne Ferrera filed a Chapter 7 bankruptcy case in this Court on July 18, 2008, In re Robert J. Ferrera and Lynne C. Ferrera, Case No. 6:08-bk-06097-KSJ, and received a discharge on November 24, 2008. The case remains open.

losses from Unit 603 in Schedule E of their 2006 and 2007 joint Federal income tax returns (Doc. Nos. 5, 6). The Debtors have not filed their 2008 Federal return.

Unit 603 is encumbered by a first-priority mortgage of approximately $279,123.00 held by Regions Bank, d/b/a Regions Mortgage ("Regions"). The monthly mortgage payment is $2,518.06. The Debtors did not state their intention regarding Unit 603 in their Statement of Intentions. They ceased making mortgage payments to Regions in November 2008. Regions sought relief from the automatic stay for pre- and post-petition mortgage payment defaults (Doc. No. 16) and its motion was granted by the Order entered on March 11, 2009 (Doc. No. 22).

### *Schedule B Assets*

The Debtors' Schedule B assets total $68,165.69 and include:

(i)     Cash on hand of $5.00.

(ii)    Four checking accounts having a total value of $166.17.

(iii)   "Options Express" account valued at $0.00.

(iv)    "OptionsXpress" Investment Account valued at $10.00 with statement "monies used to pay delinquent mortgage payments."

(v)     Various electronics valued at $620.00.

(vi)    Household furnishings, goods, sports equipment, and books valued at $2,394.00.

(vii)   Clothing valued at $450.00.

(viii)  Jewelry and two Gucci watches valued at $750.00.

(ix)    Two Prudential Life Insurance policies valued at $7,870.00.

(x)     Florida Prepaid College account for daughter valued at $9,184.00.

(xi)    401(k) retirement account with SunTrust valued at $9,756.10.

 (xii)  IRA with American Century Investments valued at $1,310.42.

 (xiii)  2006 Dodge Charger valued at $14,500.00.

 (xiv)  2008 Jeep Cherokee valued at $21,150.00.

The Debtors claimed all of the Schedule B assets, with the exception of the vehicles and a portion of the furnishings, as fully exempt in Schedule C. They claimed no real property as exempt in Schedule C.

 The Debtors, in addition to the Jeep Cherokee and Dodge Charger, lease an Infiniti G375. The Jeep Cherokee and Dodge Charger are encumbered and have no equity. Each vehicle has a significant monthly payment. The Debtors set forth in their Statement of Intentions they intend to retain and reaffirm the Jeep Cherokee and the Dodge Charger and surrender the Infiniti.

 The Jeep Cherokee is owned individually by Mr. Ricci and driven primarily by him. It was purchased in August 2008 and has a value of $26,850.00. It is encumbered by a lien of $65,058.16 held by Chrysler Financial Services. The original 2008 loan amount was $68,696.64. The Debtors filed a Reaffirmation Agreement executed by Mr. Ricci pursuant to which the Debtors agreed to reaffirm the entire debt of $65,058.16, with interest at 10.29% per annum, and to make monthly payments of $954.12 to Chrysler for 68 months (Doc. No. 36).

 A hearing was held and the Court entered an Order on July 2, 2009 denying the Reaffirmation Agreement on the basis it was not in the best interest of the Debtors (Doc. No. 46). The Debtors continue to make payments on the Jeep Cherokee post-petition.

 The Dodge Charger is owned by Mr. Ricci and is driven exclusively by the Debtors' son. They pay all of the vehicle's expenses. They assert the vehicle is

necessary for their son to travel between school and home. The vehicle has a value of $14,500.00 and is encumbered by a lien of $22,317.93 held by Insight Financial Credit Union. The original loan amount was $39,760.06. The Debtors filed a Reaffirmation Agreement executed by Mr. Ricci pursuant to which the Debtors agreed to reaffirm the entire debt of $22,317.93, with interest at 5.19% per annum, and to make monthly payments of $644.00 to Insight (Doc. No. 26). A hearing was held and the Court granted the Reaffirmation Agreement (Doc. No. 45).

The Debtors acquired the Infiniti, the high-end luxury model, from Infiniti Financial in December 2008. The vehicle is driven primarily by Mrs. Ricci. The lease term is forty-two months with monthly payments of $933.00 and a buyout option of $24,992.80. The Debtors stated in their Statement of Intentions they intend to surrender the Infiniti and the lease will not be assumed. They listed Infiniti Financial in Schedule F as having a general unsecured claim of $37,328.40. They, in contradiction of their Statement of Intentions, have not surrendered the Infiniti or sought to reject the lease. Mr. Ricci stated they intend to keep the Infiniti.

The Debtors owned another vehicle, a 2004 BMW 645, when they acquired the Infiniti. They surrendered the BMW to Insight Financial prepetition in January 2009 and listed Insight Financial in Schedule F as having a general unsecured debt of $18,721.69 resulting from the surrender. Insight Financial has not indicated whether the vehicle has been sold.

### *Unsecured Creditors*

The Debtors' creditors were not required to file claims because of the no asset designation. Two creditors filed claims: (i) the Seminole County Tax Assessor filed

Claim No. 1-1 as a secured claim of $9,753.51 for estimated 2009 property taxes for the Residence; (ii) Insight Financial filed a Claim No. 2-1 as an unsecured claim of $18,721.69 for "money loaned" apparently relating to the surrendered BMW.

The Debtors listed no unsecured priority debts in Schedule E and Schedule F general unsecured debts of $347,843.31. Their debts are primarily consumer debts. The majority of their unsecured debts consist of credit card debt of $236,382.00 incurred through twenty-two credit card accounts. Their remaining unsecured debt of $111,461.31 includes the BMW deficiency, Infiniti lease, homeowner association fees for the Longwood and Daytona Beach properties, and personal loans of $52,289.64 against the Debtors' life insurance policies.

Mr. Ricci explained the Debtors used their credit cards for "living expenses" to carry them through a period of decreased income in 2008 and they intended to fully repay their debts after he received a promotion. Mr. Ricci stated his 2008 income was less than previous years and his supervisor had promised him a promotion which would increase his base salary by fifty percent and his commission pay by fifty percent. The promotion was purportedly rescinded in November 2008 and caused the Debtors to file for bankruptcy protection.

His testimony was not credible. The Debtors have a history of excessive credit card use. The debt balances on most of their credit cards were incurred over the course of several years and not during 2008. Mr. Ricci testified the Debtors had substantial credit card debt in earlier years. The Debtors' bank statements reflect a pattern of excessive spending. They spend their income as soon as it is deposited, spending most of it on non-essential, luxury or indulgent items. Their income is spent on day trading, day trading

brokerage fees, daily restaurant dining, daily retail store purchases, beauty salons, landscaping, tennis, the vehicles, the Residence's mortgages, and cash withdrawals (UST's Ex. Nos. 12, 14, 15).

The Debtors' post-petition spending patterns mirror their pre-petition spending patterns. They continue to be financially irresponsible and have made no material effort to reduce their spending.

Mr. Ricci's assertion the Debtors intended to repay the credit card debt was not credible. The Debtors stopped making credit card payments in November 2008 when they met with bankruptcy counsel. They stopped making payments in contemplation of bankruptcy. Mr. Ricci testified the Debtors' intentions are to retain the Residence, modify the mortgages, direct all of their income to payment of the modified mortgages, and discharge their liabilities. They did not and do not intend to repay any of their unsecured liabilities.

### *Income and Expenses*

Mr. Ricci has been involved in the banking industry since 1985. He has fifteen years of retail mortgage experience and nine years of wholesale mortgage experience. He is self-taught. He has been with SunTrust's mortgage wholesale division for approximately four years. He was employed by and had an interest in Premier Mortgage Group from 1992 through May 2008. He has no experience with mortgage approvals, but determines whether a mortgage application is likely to be approved.

Mr. Ricci earns a base salary plus commissions with SunTrust. The Debtors' 2006 Federal Income Tax Return reflects the Debtors had gross wages of $352,324.00 and adjusted gross income, after the deductions of losses, of $322,538.00 (Doc. No. 5).

Their 2007 Federal Income Tax Return reflects gross wages of $266,923.00 and adjusted gross income of $264,819 (Doc. No. 6). They received refunds of $27,658.00 and $45,867.00 for tax years 2006 and 2007. They received the refunds in September 2008 (UST's Ex. No. 12).

Mr. Ricci's prepetition pay advices reflect he earned an annual base salary of $48,000.00 with SunTrust (Doc. No. 7). He was paid $2,000.00 biweekly plus fluctuating monthly commissions and a $300.00 car allowance. His prepetition commissions were: (i) $4,404.74 in December 2008; (ii) $6,478.46 in November 2008; (iii) $6,263.02 in October 2008; (iv) $5,087.84 in September 2008; (v) $6,727.14 in August 2008; (vi) $8,368.80 in July 2008; and (vii) $15,815.51 in December 2007. Federal income taxes, voluntary 401(k) retirement contributions, and medical and dental insurance premiums are deducted from his pay. SunTrust matches his 401(k) contributions. He increased his federal tax withholding allowances from six to ten in 2008.

The Debtors set forth in Schedule I Mr. Ricci's gross monthly wages, salary, and commissions from SunTrust on the Petition Date totaled $10,521.67 and his monthly net income was $8,250.31 (Doc. No. 1). Mrs. Ricci receives gross monthly income of $405.00 and net income of $288.44 after the deduction of business expenses (Doc. Nos. 1, 8). The Debtors, on the Petition Date, had a combined average monthly net income of $8,538.75, which includes unspecified rental income of $15.00. The Debtors were required to disclose in Question 17 of Schedule I "any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document." They left Question 17 blank. They have not filed an amended Schedule I.

The Debtors' Schedule I monthly income is insufficient to meet their monthly expenditures. They listed monthly expenses of $13,089.30 in Schedule J resulting in negative monthly net income of $4,550.55. Their monthly expenses include:

(i)     $5,698.18 for SunTrust mortgage on Residence;

(ii)    $899.00 for National City mortgage on Residence;

(iii)   $885.00 for utilities, phones, and internet;

(iv)    $1,000.00 for food and clothing;

(v)     $330.00 for transportation, recreation, and charitable contributions;

(vi)    $456.00 for life insurance;

(vii)   $340.00 for car insurance;

(viii)  $954.12 for the Jeep Cherokee;

(ix)    $644.00 for the Dodge Charger;

(x)     $933.00 for the Infiniti;

(xi)    $100.00 for business expenses;

(xii)   $250.00 for home owner's fees; and

(xiii)  $600.00 for education.

Schedule J does not accurately reflect the Debtors' monthly expenses. The Debtors' mortgage and homeowner association expenses related to the Deer Valley and Unit 603 properties were not included in Schedule J. The Debtors' bank statements reflect the National City mortgage payment for the Residence is $1,053.00 and not $899.00.

Mr. Ricci's $300.00 car allowance is not accounted for in Schedule I or J. The Debtors list $0.00 for home maintenance, but have unlisted monthly maintenance expenses of $402.00 consisting of $30.00 for their home security system, $150.00 for

lawn care, $100.00 for pest control, $75.00 for maid services, and $47.00 for pool upkeep.

The $600.00 educational expense represents the average cost for the son's room and board at college. The son has a Florida Bright Futures Scholarship and the Debtors receive a seventy-five percent tuition reimbursement. They prepaid some or all of the son's tuition through the Florida Prepaid College Plan.

### *UST's Investigation*

The Debtors' Section 341 meeting of creditors was held and concluded on February 27, 2009. The UST conducted a Rule 2004 examination of the Debtors on April 3, 2009. The Debtors' Rule 2004 testimony was inconsistent with their Section 341 testimony. They testified at the 2004 examination they intended to retain the Residence and had paid $16,000.00 to SunTrust prepetition to cure the mortgage arrearages. They had not previously disclosed the SunTrust payment.

The Debtors filed an Amended Statement of Financial Affairs on April 22, 2009 (Doc. No. 37) listing in Question No. 3 a transfer of "$16,000.00" to SunTrust on January 28, 2009 "to bring mortgage current." The amended disclosure is not accurate. The Debtors' January 2009 Chase Bank/Washington Mutual checking account statement reflects they transferred $16,891.71 to SunTrust *post-petition on January 30, 2009* (UST's Ex. No. 12). The funds transferred to SunTrust came from Mr. Ricci's January 30, 2009 SunTrust paycheck deposit of $14,812.07 and the remainder, $2,079.64, came from the account's preexisting balance.[5]

---

[5] The account had a beginning balance of $2,210.74 on January 9, 2009. Total deposits of $41,861.68 and total withdrawals of $40,778.60 were made. The account balance on January 28, 2009 was $1,970.85 (UST's Ex. No. 12).

Mr. Ricci stated the SunTrust transfer was to pay the SunTrust mortgage arrearages for October, November, and December 2008. He explained the Debtors intended to transfer the funds to SunTrust prepetition and had expected the transfer would clear prepetition. He asserted they did not know when their counsel would file their petition and did not realize it would be filed on January 28, 2009.

His explanation was not credible. The Debtors did not have sufficient funds in the Chase account to make the arrearage payment on or shortly before January 28, 2009. The SunTrust transfer was primarily funded by Mr. Ricci's SunTrust employment income. The SunTrust payroll deposit of $14,812.07 was made on January 30, 2009 and the Debtors immediately transferred $16,891.71 to "SunTrust Mortg Mortg Pmt xxxxx6073."

The Debtors strategically timed the filing of their bankruptcy case to precede the commission deposit. Mr. Ricci receives his monthly commission payment on the last day, or one day prior to the last day, of each month. They knew Mr. Ricci would receive a substantial commission on January 30, 2009. They first met with bankruptcy counsel in November 2008 and signed their petition and accompanying bankruptcy papers on January 28, 2009. They intended and expected their bankruptcy case would be filed on January 28, 2009.

The particular month in which the Debtors filed their bankruptcy case was strategic. The Debtors knew Mr. Ricci was going to be promoted and receive a substantial pay increase in January 2009. They strategically timed the filing to occur before his pay increase took effect. His pay increase took effect on January 30, 2009. Mr. Ricci's six-month prepetition monthly average commission was $6,221.53 (Doc. No.

7). His base pay remains the same, but his commission more than tripled post-petition (UST's Ex. No. 9). He received average monthly commissions of $23,776.63 from January 30 through June 30, 2009 with total commissions of $142,659.77.

Mr. Ricci continues to claim ten Federal income tax allowances, resulting in excessive Federal withholdings and the significant reduction of his take home pay (UST's Ex. No. 9). He increased his 401(k) contributions post-petition from approximately $102.00 per month to approximately $480.00 per month (Id.).

The Debtors' January 2009 Chase checking account statement reflects other funds and transactions the Debtors did not disclose. They transferred $3,400.00 to the Florida Prepaid College Fund on January 14, 2009, which they did not disclose in their Statement of Financial Affairs.

The Chase account had a balance of $1,970.85 on the Petition Date. The Debtors listed a total balance of $119.17 for their Chase accounts on the Petition Date. The $1,970.85 constitutes property of the estate. The Debtors misrepresented the amount of funds they had in the Chase account on the Petition Date. Funds constituting property of the estate were transferred to SunTrust on January 30, 2009. Such transfer constitutes an unauthorized transfer of property of the estate.

A wire transfer deposit of $16,742.76 was made into the Chase account on January 29, 2009. The funds came from the Debtors' OptionsXpress investment account, which the Debtors valued at $10.00 in Schedule B. They misrepresented the value of the OptionsXpress account. The account had a value of least $16,742.76 on the Petition Date. The funds in the OptionsXpress account constituted property of the estate on the Petition Date.

The Debtors transferred $12,000.00 from their Chase checking account on January 30, 2009 to an account with ThinkorSwim, Inc., which is an online investment company (UST's Ex. Nos. 12, 13, 15). The Debtors had two ThinkorSwim accounts on the Petition Date, which they did not disclose in their bankruptcy papers or at their meeting of creditors. Mr. Ricci had opened the accounts prepetition. He explained the accounts were not disclosed because one account had not been funded as of the Petition Date and the second account is his son's account. The Debtors have not amended Schedule B.

The Debtors have accumulated cash of $20,000.00, or more, post-petition. Most of those funds have been transferred to Mr. Ricci's ThinkorSwim accounts. The Debtors, in addition to the $12,000.00 transfer to the account, transferred $4,000.00 on February 11 and $5,000.00 on February 27, 2009. The Debtors transferred $2,000.00 to their son in June 2009. Mr. Ricci explained the $2,000.00 was to be used by the son for on-line investing. Mr. Ricci hired a stock consultant post-petition to whom he paid $2,493.00 for investment advice.

The Debtors' additional income disclosures in their Statement of Financials are inaccurate. They listed in Question 2 "rental income" of $11,519.00 received in 2008 and no income in 2007 or 2009. The Debtors' Chase Bank checking account statements reflect they received from July 1, 2008 through December 31, 2008 rental income of $11,824.00 from the Ferreras and $2,618.91 from Unit 603. They may have received rental income from these properties during the period January 1, 2008 through June 30, 2008 and, if so, this rental income has not been disclosed. The Debtors' 2007 Federal income tax return reflects they received rental income, but they did not disclose the

income in their Statement of Financial Affairs. They did not disclose any investment trading income or losses in Question 2 or 8 of their Statement of Financial Affairs.

### *Motion to Dismiss*

The UST timely filed its Motion to Dismiss and seeks dismissal of this case as an abusive filing on two alternative grounds: (i) the Debtors filed their petition in bad faith; or (ii) the totality of the Debtors' financial situation demonstrates abuse. The Debtors' Means Test sets forth the presumption of abuse does not arise pursuant to Section 707(b)(2) of the Bankruptcy Code (Doc. No. 1). The UST originally filed a Notice finding the presumption of abuse had arisen pursuant to Section 707(b)(2). The UST rescinded that finding through its Notice filed on July 22, 2009 (Doc. No. 53). The UST is not challenging the Debtors' bankruptcy filing pursuant to Section 707(b)(2).

No other parties in interest have objected to the Debtors' bankruptcy. No adversary proceedings have been filed against the Debtor, including Section 523 dischargeability of debt actions. The Debtors' credit card creditors have not challenged the dischargeability of the credit card debts.

The Debtors assert the Motion to Dismiss is an impermissible challenge to their constitutional right to a homestead exemption. Mr. Ricci testified the Debtors' sole intention in filing for bankruptcy is to preserve their Residence. They intend to modify the Residence's mortgages and use all of their disposable income to pay the mortgages. They contend Chapter 7 does not require the surrender of a homestead.

### *Analysis*

Section 707(b)(3) is a subjective test that turns upon the particular facts of a case. The UST has the burden to establish this case constitutes an abusive filing pursuant to Section 707(b)(3)(A) or Section 707(b)(3)(B).

### *Bad Faith*

Bad faith is determined on a case by case basis through the analysis of circumstantial factors considered to be indicia of bad faith. The core factors, having been developed through pre-BAPCPA case law, are historical. The list of circumstantial factors relevant to a Section 707(b)(3)(A) has been expanded post-BAPCPA and continues to expand. The list of factors is not exclusive, and may include factors unique to a particular case.

The Debtors have not sought the protections of Chapter 7 with good faith intentions. They:

    (i)     acquired a luxury car with a monthly lease payment of $933.00 shortly before filing this case;

    (ii)    timed the filing of the bankruptcy to precede Mr. Ricci's significant raise which more than tripled his monthly income;

    (iii)   have manipulated their monthly income by claiming excessive Federal exemptions and increasing Mr. Ricci's 401(k) contributions;

    (iv)   made transfers on the eve of filing and unauthorized post-petition transfers;

    (v)    made material misrepresentations and omissions in their bankruptcy papers;

    (vi)   attempted to conceal substantial cash assets that constitute property of the estate and transfers of those assets;

    (vii)  made false statements at their meeting of creditors;

(viii)   lacked candor with the Court;

(ix)    have made no meaningful effort for financial rehabilitation;

(x)     attempted to reaffirm a debt of $65,058.16 for the Jeep Cherokee knowing the vehicle has a value of $26,850.00 and have not surrendered the vehicle and continue to make payments;

(xi)    continue to spend a significant portion of their income on day trading, brokerage fees, restaurants, and non-essential retail purchases; and

(xii)   subsidize Mr. Ricci's sister and her family.

Their unsustainable extravagant lifestyle caused their bankruptcy filing. They continue to live an extravagant lifestyle to the detriment of their creditors. The majority of their income is spent on the Residence's mortgages and three luxury vehicles, which have no equity.

The Debtors have acted in bad faith. They have acted purposefully with the intent to abuse the Chapter 7 provisions. The UST has established granting the Debtors relief would be an abuse of the Chapter 7 provisions. This case is due to be dismissed pursuant to Section 707(b)(3)(A) of the Bankruptcy Code.[6]

### *Totality of the Circumstances*

The circumstances surrounding the Debtors' financial situation are relevant in determining whether they are entitled to Chapter 7 relief. The core inquiry of the totality

---

[6] This Court addressed Section 707(b)(3) in In re Sara Reese, 402 B.R. 43 (Bankr. M.D. 2008) and determined grounds for dismissal based upon bad faith or the totality of the circumstances did not exist. The Reese case is distinguishable from the Debtors' case in several respects. Reese did not make misrepresentations or intentional omissions in her financial disclosures. Her Schedules, particularly I and J, and Statement of Financial Affairs contained inaccuracies, but the inaccuracies were the result of poor record-keeping and Reese made her best efforts in completing her bankruptcy papers. Reese earned, at best, $30,000.00 annually and had no ability to repay even a nominal amount of her debts. Reese's husband had substantial control over their financial decision-making and was not a debtor before this Court.

of the circumstances test is whether the Debtors have a meaningful ability to repay their unsecured debts. Pre- and post-petition events are relevant to the analysis.

The Debtors had a meaningful ability on the Petition Date to repay their unsecured creditors. Their ability to repay their unsecured creditors increased substantially post-petition with Mr. Ricci's pay increase. The Debtors have combined average net income of at least $16,240.45 based upon Mr. Ricci's post-petition pay advices (UST's Ex. No. 9).

The Debtors received $73,525.00 in tax refunds in 2008, which translates to an additional $6,127.00 in monthly income. There is a realistic expectation the refunds will continue prospectively. The Debtors' net income would further increase by the elimination or reduction of Mr. Ricci's monthly $480.00 401(k) contributions.

The Debtors, based upon their Schedule I total expense amount of $13,089.30, have disposable income of at least $3,151.15. Monthly payments of $3,151.15 made over sixty months would result in repayment of $189,069.00. Their general unsecured creditors, based upon the total debt amount of $347,843.31 in Schedule F, and not accounting for possible claim objections and administrative costs, would receive a payout of roughly fifty-four percent.

The payout to unsecured creditors would increase dramatically if the Debtors' budget included only reasonable and necessary expenses. The majority of their monthly expenses are not reasonable or necessary and are excessive and unreasonable. The Debtors' expenditures for the Residence and the vehicles are excessive and unreasonable based upon the circumstances. It is neither necessary nor reasonable for the Debtors to live in the Residence or to maintain three vehicles.

Their monthly expenses would be substantially reduced if they down-sized and obtained alternative housing with reasonable monthly mortgage or rental payments and surrendered the Jeep Cherokee or the Infiniti. Finding alternative housing would reduce the Debtors' maintenance costs including utilities, landscaping, and taxes. The surrender of the Jeep Cherokee or Infiniti would reduce the Debtor's monthly expenses by approximately $900.00, which would increase their monthly disposable income to $4,051.15. Sixty payments of $4,051.15 would result in a distribution of $243,069.00 to the Debtors' unsecured creditors resulting in a payout of almost seventy percent.

The Debtors' ability to pay such a significant portion of their unsecured debts establishes it would be an abuse of the Chapter 7 provisions to grant them relief. Additional circumstances establish granting the Debtors relief would constitute abuse:

(i)     Mr. Ricci is experienced in financial matters and the Debtors have experience with Chapter 7 bankruptcy procedure.

(ii)    The Debtors carefully orchestrated and strategically timed the filing of their bankruptcy on the eve of Mr. Ricci's significant income increase.

(iii)   Mr. Ricci has stable employment with SunTrust.

(iv)    The Debtors manipulated Mr. Ricci's net income by claiming excessive Federal allowances.

(v)     The Debtors made substantial prepetition transfers and substantial unauthorized post-petition transfers of estate assets.

(vi)    The Debtors made intentional material misrepresentations and omissions in their Schedules, Statement of Financial Affairs, and Statement of Intentions and at their meeting of creditors.

(vii)   Mr. Ricci's testimony was not credible.

(viii)  The Debtors have made no effort and have no intention to reduce their expenses and continue to live a luxurious lifestyle.

    (ix)    The Debtors continue to retain and pay substantial monthly amounts for three luxury vehicles that have no equity.

    (x)    The Debtors continue to retain and make substantial mortgage payments on the Residence, which has no equity.

    (xi)    The Debtors substantially increased their monthly expenses by acquiring the Infiniti shortly before filing their case. The Debtors, when they surrendered the BMW, had the opportunity to reduce their vehicle obligations. Instead, they increased their vehicle obligations by leasing the Infiniti and incurring a $933.00 monthly lease obligation.

    (xii)    The Debtors subsidize Mr. Ricci's sister and her husband by providing them a home rent-free and paying their utilities.

    (xiii)    Their bankruptcy filing was not the result of an unforeseen or catastrophic event.

The UST has established the totality of the circumstances of the Debtors' financial situation demonstrates granting the Debtors relief would be an abuse of the provisions of Chapter 7. Granting the Debtors relief would be an abuse of the provisions of Chapter 7. The UST's Motion is due to be granted pursuant to Section 707(b)(3)(B).

## CONCLUSIONS OF LAW

A Chapter 7 case filed after the enactment of BAPCPA by an individual with primarily consumer debts is subject to dismissal, or conversion with the debtor's consent, if, after notice and a hearing, a Court "finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1) (2007). The standard for dismissal prior to BAPCPA was "substantial abuse."

The 2005 Bankruptcy Code amendments, as is manifest by the legislation's title, "Bankruptcy Abuse Prevention and Consumer Protection Act," were intended to curb what was perceived to be abusive bankruptcy practices, and to ensure debtors with the ability to repay their debts do so:

> The purpose of the bill [S. 256] is to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy system and ensure that the system is fair for both debtors and creditors.
>
> . . .
>
> The heart of the bill's consumer bankruptcy reforms consists of the implementation of an income/expense screening mechanism ('needs-based bankruptcy relief' or 'means testing'), which is intended to ensure that debtors repay creditors the maximum they can afford.

H.R. REP. No. 109-31, pt. 1, at 2 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 89.

Congress created in Section 707(b) a needs-based test to remedy the "inherently vague" "substantial abuse" dismissal standard. Id. at 12, U.S.C.C.A.N. at 98. Section 707(b) contains two tests for determining abuse: the objective test of Section 707(b)(2) and the subjective test of Section 707(b)(3). In re Parada, 391 B.R. 492, 496 (Bankr. S.D. Fla. 2008). The objective test of Section 707(b)(2) is not relevant to this proceeding due to the UST's withdrawal of its presumption of abuse finding. A Bankruptcy Court may dismiss a petition even if there is no presumption of abuse. 11 U.S.C. § 707(b)(3); Egebjerg v. Anderson (In re Egebjerg), 574 F.3d 1045, 1048 (9th Cir. 2009).

The UST has the burden to establish the Debtors' filing is abusive pursuant to Section 707(b)(3) by a preponderance of the evidence. In re Pandl, 407 B.R. 299, 301-302 (Bankr. S.D. Ohio 2009). Section 707(b)(3) sets forth two bases for dismissal:

> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3). The UST seeks dismissal of this case pursuant to Section 707(b)(3)(A), or, in the alternative, Section 707(b)(3)(B).

Pre-BAPCPA case law is relevant in Section 707(b)(3)(A) and Section 707(b)(3)(B) determinations. In re Henebury, 361 B.R. 595, 604 (Bankr. S.D. Fla. 2007). "Section 707(b)(3) incorporates the judicially constructed concepts of bad faith and totality of the circumstances. Therefore pre-BAPCPA case law applying these concepts can assist in determining if abuse exists under BAPCPA." Id. The phrase "substantial abuse" was defined pre-BAPCPA to mean "that which shocks the conscience of the Court." In re Degross, 272 B.R. 309, 314 (Bankr. M.D. Fla. 2001). The Eleventh Circuit Court of Appeals has not yet addressed Section 707(b)(3)(A) or 707(b)(3)(A).

The Debtors' debts are primarily consumer debts. 11 U.S.C. § 101(8). They are subject to the provisions of Sections 707(b)(1) and (b)(3). The do not seek rejection of a personal services contract.

### Bad Faith

Good faith is an implicit requirement for filing for bankruptcy protection. Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394 (11th Cir. 1988); Shell Oil Co. v. Waldron (In re Waldron), 785 F.2d 936, 941 (11th Cir. 1986). There is no constitutional right to a bankruptcy discharge. U.S. v. Kras, 409 U.S. 434, 445 (1973). The bankruptcy laws are "intended to give a 'fresh start' to the 'honest but unfortunate debtor.'" Marrama v. Citizens Bank of Mass., 127 S. Ct. 1105, 1116 (2007) (*citation omitted*). Attempting to use bankruptcy to obtain a "head start" rather than a "fresh start" constitutes abuse. In re Krohn, 886 F.2d 123, 127-128 (6th Cir. 1989).

A petition filed in "bad faith" is subject to dismissal pursuant to 11 U.S.C. Section 707(b)(3)(A). The Bankruptcy Code does not define "bad faith." BAPCPA's legislative

history does not define "bad faith."  The existence of bad faith is determined by circumstantial factors, which have been developed through case law.  The historical factors set forth in pre-BAPCPA case law are relevant to a Section 707(b)(3)(A) analysis. In re Parada, 391 B.R. at 499.

The circumstantial factors include, but are not limited to:

(i)    The debtor has only one asset in which it does not hold legal title.

(ii)    The debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors.

(iii)    The debtor has few employees.

(iv)    The debtor is not financially distressed.

(v)    The property is the subject of a foreclosure action as a result of arrearages on the debt.

(vi)    The debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in a state court action.

(vii)    The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

(viii)    The debtor made purchases on the eve of filing.

(ix)    Incomplete or false disclosures by the debtor.

(x)    Failure by the debtor to cooperate with the trustee.

(xi)    Manipulation of income.

In re Phoenix Picadilly, Ltd., 849 F.2d at 1394-95; In re Waldron, 785 F.2d at 939-40; In re Parada, 391 B.R. at 499; In re Schwenk, __ B.R. __, Case No. 1:08-bk-03055MDF, 2009 WL 975160, at *3 (Bankr. M.D. Pa. Apr. 10, 2009).  The list of factors is non-exclusive and dismissal is determined on a case by case basis. State Street Houses, Inc.

v. New York State Urban Dev. Corp. (In re State Street Houses, Inc.), 356 F.3d 1345, 1347 (11th Cir. 2004); In re Parada, 391 B.R. at 499.  A debtor's ineligibility to qualify for Chapter 13 is not dispositive of whether the case may be dismissed pursuant to Section 707(b):

> The anomalous result of saying those whose high unsecured indebtedness renders them ineligible for Chapter 13 treatment can always avoid § 707(b) dismissal, would be rewarding outrageous abusers of consumer credit, while denying to those with more moderate consumer debt the benefits of Chapter 7 . . . [Congress'] failure to specifically provide for linkage between Chapters 7 and 13 is evidence that Congress believed there are some circumstances where it would not be equitable to grant a particular debtor a fresh start.

In re Krohn, 886 F.2d at 127.

The common thread running through all of the indicia of bad faith is improper intent.  A debtor, for bad faith to exist, must have purposefully acted and such action was motivated by an improper purpose.  Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.), 749 F.2d 670, 674 (11th Cir. 1984) ("In finding a lack of good faith, courts have emphasized an intent to abuse the judicial process . . . ."); In re Waldron, 785 F.2d at 941 ("[I]t is incumbent upon the bankruptcy courts to examine and question the debtor's motives" where a "petition appears to be tainted with a questionable purpose."); Bilzerian v. SEC (In re Bilzerian), 276 B.R. 285, 294 (M.D. Fla. 2002) (dismissing debtor's petition where his "motives and purposes" in filing were not consistent with the purposes of chapter 7).

A multitude of indicia of bad faith are present in the Debtors' case.  The Debtors intentionally timed the filing of their case to precede Mr. Ricci's income increase in order to manipulate the Means Test and to avoid paying their unsecured creditors.  They made transfers on the eve of filing and unauthorized post-petition transfers.  They filed

incomplete and false disclosures. They lack candor. Their motives in filing their case are inconsistent with the purposes of Chapter 7. They filed their petition in bad faith.

The Debtors are neither honest nor unfortunate. Granting the Debtors relief would be an abuse of the provisions of Chapter 7. This case is due to be dismissed pursuant to 11 U.S.C. Section 707(b)(3)(A).

### *Totality of the Circumstances*

The "totality of the circumstances" test of Section 707(b)(3)(B) focuses solely on a debtor's financial situation and the indicia of bad faith are irrelevant. In re Parada, 391 B.R. at 499. Congress' creation of the disjunctive provisions (A) and (B) of Section 707(b)(3) establishes "bad faith" "is a basis for 707(b) relief independent of financial circumstances indicating that the debtor could repay debt." Eugene R. Wedoff, Means Testing in the New § 707(b), 79 Am. Bankr. L.J. 231, 236 (Spring 2005).

The primary inquiry of a Section 707(b)(3)(B) analysis is whether the debtor's financial situation indicates he has the ability to pay a substantial portion of his unsecured nonpriority debts. In re Henebury, 361 B.R. at 607. The courts utilize the 11 U.S.C. Section 1325 definition of "disposable income" in conducting the ability to pay analysis. Id. at 611. Section 1325(b)(2) defines "disposable income" as:

> (2)  Current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonable necessary to be expended for such child) less amounts reasonably necessary to be expended—
>
> (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
>
>    (ii) for charitable contributions . . . and

(B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (2007).

A debtor's ability to repay creditors is a primary, but not a conclusive factor in determining whether abuse exists. In re Norwood-Hill, 403 B.R. 905, 912 (Bankr. M.D. Fla. 2009). Other relevant factors include, but are not limited to:

(1) whether unforeseen or catastrophic events such as sudden illness, disability, or unemployment propelled the debtor into bankruptcy;

(2) whether the debtor's standard of living has substantially improved as a result of the bankruptcy filing or essentially remained the same;

(3) the debtor's age, health, dependents, and other family responsibilities;

(4) the debtor's eligibility for Chapter 13 relief and whether creditors would receive a meaningful distribution in a Chapter 13 case;

(5) the age of the debts for which the debtor seeks a discharge and the period over which they were incurred;

(6) whether the debtor incurred cash advances and made consumer purchases far in excess of the ability to repay;

(7) whether the debtor made any payments toward the debts or attempted to negotiate with her creditors;

(8) the accuracy of the debtor's schedules and statement of current income and expenses; and

(9) whether the debtor filed the petition in good faith;

(10) employment stability;

(11) retirement plan contributions and the debtor's age;

(12) whether living expenses can be reduced without depriving the debtor or his dependents of adequate food, clothing, shelter, and other necessities; and

(13) the availability of non-bankruptcy remedies including state law relief, private negotiations, and "good, old-fashioned belt tightening."[7]

In re Krohn, 886 F.2d at 126-128; In re Norwood-Hill, 403 B.R. at 912-913; In re Carney, No. 07-31690, 2007 WL 4287855, at *3, 7-10 (Bankr. N.D. Ohio Dec. 5, 2007).

Post-petition pre-discharge events are relevant to a Section 707(b)(3)(B) analysis. In re Parada, 391 B.R. at 500; In re Henebury, 361 B.R. at 611. The Courts have "not viewed favorably debtors who seek to maintain expensive homes or vehicles while simultaneously seeking to discharge their voluntarily incurred unsecured obligations." In re Durczynski, 405 B.R. 880, 884 (Bankr. N.D. Ohio 2009). "[W]hen seeking bankruptcy relief, debtors may be expected to do some belt tightening, including, where necessary, foregoing the reaffirmation of those secured debts which are not reasonably necessary for the maintenance and support of the debtor and his family." Id. (citing In re Wadsworth, 383 B.R. 330 (Bankr. N.D. Ohio 2007)).

A debtor's budget is excessive and unreasonable where the mortgage payment is substantial and the property has no or little equity. In re Durczynski, 405 B.R. at 887; In re Crink, 402 B.R. 159, 171 (Bankr. M.D.N.C. 2009); In re Lubinski, Case No. 07-31230, 2008 WL 2388127 (Bankr. N.D. Ohio 2008); In re Moreland, Case No. 05-10519, 2005 WL 1925460 at *5-6 (Bankr. M.D.N.C. 2005). A budget is unreasonable where a debtor's expenditures manifest a desire to maintain a standard of living which precipitated the bankruptcy filing. Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (M.D.N.C. 2004).

The totality of the circumstances reflects abuse exists. The Debtors have a meaningful ability to repay a substantial portion of their unsecured debts. Mr. Ricci has

---

[7] In re Krohn, 886 F.2d at 128.

stable employment. He received a significant raise two days after the Debtors filed this case and income more than tripled. The Debtors' average monthly net income is at least $16,240.45, but would be considerably greater if their tax refunds and 401(k) contributions were included as income and Mr. Ricci's withholdings were reduced. There is a realistic expectation the tax refunds will continue prospectively.

Tax refunds should be included in the calculation of a debtor's income for Section 707(b)(3) purposes if there is a "realistic expectation the refunds will continue prospectively." In re Pandl, 407 B.R. at 302. Retirement contributions should be included in the calculation. Id. "To hold otherwise would force a debtor's creditors to fund the debtor's retirement plan." Id.

The Debtors have disposable monthly net income even if all of their Schedule I expenses are allowed. They have disposable monthly net income of at least $3,151.15. The Debtors could repay their scheduled unsecured general creditors approximately fifty-four percent through sixty months of payments. The payout percentage would increase substantially if the Debtors' excessive and unreasonable budget expenses were eliminated or reduced.

The Debtors have engaged in excessive post-filing spending and are paying unnecessarily high housing and car payments. Their costs relating to the Residence are excessive. The Residence has no equity and the mortgage payments constitute more than forty percent of Mr. Ricci's net income, not including the landscaping and maintenance costs. The Debtors do not require three vehicles and the expenses of the luxury vehicles are excessive and unreasonable. The costs related to the condominiums and Fox Valley Property are excessive, unreasonable, and unnecessary.

The Debtors have the ability to make meaningful payments to their creditors either through or outside of bankruptcy. The totality of the circumstances reflects it would be an abuse of the provisions of Chapter 7 to grant them relief. The UST has established the Debtors are not entitled to relief and this case is due to be dismissed pursuant to 11 U.S.C. Section 707(b)(3)(B).

### Conclusion

Bankruptcy is intended to provide relief to the "honest, but unfortunate debtor." The Debtors are not honest nor are they unfortunate. They continue to live a lifestyle that caused them to file for bankruptcy. Their spending is extravagant and irresponsible. They made false representations and omitted material information in their bankruptcy disclosures. They timed the filing of their bankruptcy case to avoid disclosure of Mr. Ricci's pay increase and to manipulate the Means Test. Their motives and purposes in filing for bankruptcy are not consistent with the purposes of the Bankruptcy Code.

The Debtors are not in dire need of Chapter 7 relief. They have the ability to repay their debts. The Debtors' case represents the perceived quintessential type of bankruptcy abuse Congress endeavored to address through BAPCPA and casts an inaccurate perception on individuals who genuinely and legitimately need the protections and benefits of a fresh start.

A man's home may be his proverbial castle, but a debtor is not entitled to retain an oversecured luxury castle when he seeks to discharge more than $300,000.00 in unsecured debt he voluntarily incurred through irresponsible, indulgent spending and has

the ability to repay a significant portion of that debt.[8]  Allowing the Debtors to retain their castle, at the expense of their unsecured creditors, would be an abuse of the provisions of Chapter 7.  Their case is due to be dismissed pursuant to 11 U.S.C. Sections 707(b)(3)(A) and 707(b)(3)(B).

Accordingly, it is

**ORDERED, ADJUDGED AND DECREED** that the UST's Motion to Dismiss is hereby **GRANTED** and the above-captioned case shall be **DISMISSED** pursuant to 11 U.S.C. Sections 707(b)(1), 707(b)(3)(A), and 707(b)(3)(B).  The effective date of this Order is delayed fourteen (14) days to permit the Debtors to convert this case to a chapter of the Bankruptcy Code for which they are eligible.

Dated this 30TH day of September, 2009.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge

---

[8] The proverb is attributed to James Otis, Jr. (1725 – 1783), who was a lawyer in colonial Massachusetts and wrote in his Against Writs of Assistance (1761), reprinted in The Annals of America, Encyclopedia Britannica, Inc. (1976), Vol. 2, 1755-1783 Resistance and Revolution selection No. 15, p. 75: "Now, one of the most essential branches of English liberty is the freedom of one's house.  A man's house is his castle; and while he is quiet, he is well guarded as a prince in his castle."  http://wiki.answers.com (last visited Sept. 30, 2009); http://en.wikipedia.org/wiki/james_otis,_jr. (last visited Sept. 30, 2009).